**IN THE UNITED STATES DISTRICT COURT**

**FOR THE EASTERN DISTRICT OF CALIFORNIA**

KARL D. HARRIS,                            No. CIV S-06-2734-CMK

         Plaintiff,

   vs.                             <u>MEMORANDUM OPINION AND ORDER</u>

COMMISSIONER OF SOCIAL
SECURITY,

         Defendant.

_____/

        Plaintiff, who is proceeding with retained counsel, brings this action for judicial review of a final decision of the Commissioner of Social Security under 42 U.S.C. § 405(g). Pursuant to the consent of the parties, this case is before the undersigned for final decision on plaintiff's motion for summary judgment (Doc. 21) and defendant's cross-motion for summary judgment (Doc. 24).

## I.  BACKGROUND

        Plaintiff applied for social security benefits on May 27, 2004.  In his application, plaintiff claims that disability began on March 7, 2004.  Plaintiff claims his disability consists of a combination of hypertension, non-ischemic cardiomyopathy, chronic renal insufficiency, congestive heart failure, sleep apnea, obesity, a bleeding duodenal ulcer, and mild depression.

1  Plaintiff is a United States citizen born July 6, 1971, with a high school education.

2      **A.**    <u>**Summary of the Evidence**</u>

3      Plaintiff summarizes the medical evidence as follows:

4      July 22, 2003, treatment notes indicated that Mr. Harris underwent an echocardiogram. The conclusions were:

5      1.    Left ventricular enlargement with eccentric hypertrophy and systolic dysfunction of global

6          hypokinesis (ejection fraction equals 35%).

    2.    Severe bi-atrial enlargement.

7      3.    Trace mitral valve regurgitation.

    4.    Mild tricuspid valve regurgitation.

8  TR 233-234.

9      July 22, 2003, treatment notes indicated that Mr. Harris reported running out of his medications four days ago, and started

10  having shortness of breath as well as edema for the past two-to-three days. Mr. Harris reported that he could not lay flat last night

11  and got very little sleep. Mr. Harris reported experiencing diaphoresis for the last three or four days. TR 227.  Mr. Harris

12  reported moderate use of alcohol and current use of marijuana and methamphetamines. TR 228.

13

14      July 22, 2003, treatment notes indicated Mr. Harris underwent an x-ray examination of his chest.  The impression was

15  that Mr. Harris had cardiomegaly with bilateral air space disease. The report indicated that Mr. Harris's heart was enlarged and his

16  geographic air space disease likely represented pulmonary edema. TR 187.

17      July 22, 2003, treatment notes indicated that Mr. Harris underwent an echocardiogram study. The conclusions were:

18      1.    Left ventricular enlargement with eccentric hypertrophy systolic dysfunction of global

19          hypokinosis (injunction faction equals 35%).

    2.    Severe bi-atrial enlargement.

20      3.    Trace mitral valve regurgitation.

    4.    Mild tricuspid valve regurgitation . . . Summary: abnormal.

21  TR 133-134.

22      July 23, 2003, treatment notes indicated that Mr. Harris was experiencing orthopnea, was in pulmonary edema, and had blood

23  pressure of 196/133. Mr. Harris's medical history was significant for a bleeding duodenal ulcer and recurrent bleeding. The

24  impression was:

    1.    Hypertensive emergency.  Had CHF as a result of severe

25          hypertension with evidence of myocardial injury by enzymes. …

26  / / /

   2.  Congestive heart failure. … Need to consider possibility of CAD, despite patient's young age. Did have enzyme leak and has abnormal EKG. All this could be secondary to severe elevation in blood pressure and hypertrophic changes in heart. …

   3.  Renal failure. … Likely secondary to longstanding hypertension. Has a large amount of edema and fluid overload for a young patient with hypertensive emergency. Has low serum protein and albumin, also unusual in young patients. Need to … look for evidence of nephrotic syndrome.

TR 227.

  July 23, 2003 treatment notes indicated that Mr. Harris underwent a chest x-ray study. The impression indicated that Mr. Harris had "bilateral air- disease with cardiomegaly. This likely represents pulmonary edema . . . " TR 185-186.

  July 24, 2003, treatment notes indicated that Mr. Harris was still hospitalized. He indicated that he had a slight headache. Notes indicated that his blood pressure was still consistently elevated and other medication for his high blood pressure was not ordered because of his renal failure. Treatment notes indicated that he experienced pulmonary edema and significant peripheral edema, accompanied by intravascular fluid overload. Notes indicated left heart hypokinesis with an ejection fraction of 50%. Notes indicated that Mr. Harris suffered from acute chronic insufficiency (CRI). Notes indicated that Mr. Harris's toxic screen was positive for methamphetamines, which may have been contributory to his hypertensive emergency.
TR 221-222.

  July 24, 2003, treatment notes indicated that Mr. Harris underwent a myocardioprofusion study. The impression indicated that Mr. Harris had a reduced left ventricular ejection fraction of 25%, and this finding was most likely due to a non-ischemic cardiomyopathy. TR 183-184.

  July 24, 2003, treatment notes indicate that Mr. Harris underwent an ETT protocol: persantine; resting EKG. The interpretation was: normal. TR 131-132.

  July 25, 2003, treatment notes indicated that Mr. Harris continued to be diagnosed with hypertensive emergency, congestive heart failure, and renal insufficiency. Notes indicated that Mr. Harris's myocardial study indicated he had a dilated left ventricle on both the Persantine and resting images, and thinning of the inferior wall. Notes indicated generalized hypokinesis of the left ventricle with a special hypokinesis of the septum. Notes indicated that Mr. Harris's blood pressure was moderately controlled, although it still appeared to be volatile, unrelated to his medication dosing. TR 215.

July 25, 2003, notes indicated that one month prior to admission, Mr. Harris was able to play ball, but a few days prior to his admission his exercise tolerance gradually decreased to the point where he had difficulties walking approximately 200 yards. He also experienced orthopnea. TR 217. Notes indicated that Mr. Harris was admitted to the hospital in heart failure. TR 218. Notes indicated that Mr. Harris had signs of end-organ damage secondary to hypertension. Mr. Harris's heart condition was regarded as non-ischemic cardiomyopathy. TR 218-219.

July 25, 2003, treatment notes indicated Mr. Harris underwent an echogram study. The impression was:
Right renal contracture: RE: the left consistent with unilateral medical renal disease and renal artery stenosis is in the differential with borderline sized discrepancy. . . . TR 181-182.

July 26, 2003, treatment notes indicated that Mr. Harris was started on Lisinopril and still "has a lot of edema in the legs." TR 211.  His active inpatient medications were acetaminophen, aluminum/magnesium/simethicone, aspirin enteric coated, Clonidine Patch, Clonidine Tab, furosemide, Lisinopril, Metroprolol, and Rabeprazole. TR 211.  Notes indicated that Mr. Harris would benefit from further diuresis. TR 212.

July 26, 2003, treatment notes reported Mr. Harris's discharge summary. Notes indicated that he was admitted on July 22, 2003, and discharged on July 26, 2003.  Notes indicated that Mr. Harris was first treated in the emergency room, transferred to the urgent care center, and finally transferred to the intensive care unit. Notes indicated that Mr. Harris appeared to suffer from sleep apnea with occasion hypoxemia. Notes indicated "very young and with very poor prognosis if does not take control of medical issues now." Mr. Harris reported plans for compliance with the recommended medical plan. TR 202.  Mr. Harris was advised to seek medical attention immediately should his clinical status change in any way, as his diseases were quite volatile and severe and they progressed very quickly. "It was specifically emphasized to him that unless he is compliant with all his medical care plans and discontinues use of meth, tobacco, and marijuana, that his BP, heart, lung, kidney, and swelling problems are all likely to get worse, leading to severe congestive heart failure, ESRD and dialysis, and very premature death." TR 203.

September 29, 2003, Treatment notes indicated that Mr. Harris received "urgent care" treatment.  Mr. Harris presented for medication refills, and reported increasing shortness of breath.  Mr. Harris's current medications were Metroprolol, Lisinopril, Furosemide, Clonidine Patch and Rabeprazole. TR 204. Notes indicated that Mr. Harris had bilateral pitting pedal edema. TR 205.

4

Notes indicated that Mr. Harris's congestive heart failure had worsened, and his chronic passive congestion had also worsened. TR 207. Notes indicated that Mr. Harris was given medication for elevated blood pressure, 183/133. TR 208.

Notes indicated that Mr. Harris was transferred to UC Davis Medical Center by ambulance. TR 209. Notes indicated that upon admission, Mr. Harris's blood pressure was 219/155. He indicated that he was "out of medication for hypertension . . . got thrown out while moving." TR 210.

September 29, 2003, treatment notes indicated that Mr. Harris underwent a chest x-ray study. The impression was:
1.     "Findings consistent with worsened pulmonary edema and cardiomegaly since 7/23/03."
TR 181.

July 19, 2004, treatment notes indicated that Mr. Harris underwent an ECG. Interpretation of the study indicated that Mr. Harris had right atrial enlargement, left axis deviation, ST/T/T wave abnormality, considered lateral ischemia.... Abnormal ECG. TR 131.

July 19, 2004, treatment notes indicated that Mr. Harris's blood pressure was extremely high at presentation period. TR 128. Notes indicated that it was discussed with Mr. Harris that he needed to be admitted to the intensive care unit to get his blood pressure and congestive heart failure, elevated creatinine under control. Mr. Harris refused admission "Despite explaining the risks of sudden death." TR 128-129.

July 19, 2004, chart notes indicated that Mr. Harris had a chest x-ray. When this x-ray was compared to a previous study performed on September 29, 2003, the following observation was made: "The heart is enlarged. Pulmonary vascular congestion is noted with a trace left-sided pleural profusion, consistent with congestive heart failure. Impression: 1. CHF. TR 107-108. On the same day Mr. Harris underwent a subsequent x-ray examination. The impression was that he had cardiomegaly with no acute process. TR 106-107.

July 29, 2004, indicated that Mr. Harris was admitted to the hospital for GI bleeding with a history of a peptic ulcer, hypertension, cardiomyopathy (EF 35%), CRI. These were also Mr. Harris's discharge diagnoses. Notes indicated that Mr. Harris had a duodenal ulcer with clot and oozing fresh blood. Notes indicated that Mr. Harris had one week of nausea, vomiting and decreased appetite. There was no known in sighting case, and he was not able to tolerate solid foods. Emergency department notes indicated that Mr. Harris was noted to have melanotic stools and significant hemotocrit drop. TR 162-163. Notes indicated that Mr.

1   Harris was transferred from the emergency room to the intensive
    care unit.  Mr. Harris's discharge medications were Omeprazole,
2   Furosemide, Lisinopril, and Metoprolol. TR 164-165.

3          August 1, 2004 treatment notes indicated that Mr. Harris
    underwent an ephenephrin injection and treatment with a heater
4   probe for his duodenal ulcer with active bleeding.  The impression
    was: "Erosive antrol gastrious and duodenal ulcer with signs of
5   active bleeding...." TR 146-147.

6          August 3, 2004, treatment notes indicated that Mr. Harris's
    medical concerns were GI bleeding, hypertension/cardiomyopathy,
7   and chronic renal insufficiency.  Mr. Harris was diagnosed with an
    ulcer with the duodenal bulb with no active bleeding. TR 180.
8
           August 3, 2004, and August 4, 2004, treatment notes
9   indicated that Mr. Harris was admitted to the hospital with the
    acute onset of epigastric pain since the early morning.  The pain
10  was observed to be sharp and non-radiating.  Mr. Harris had a
    bowel movement that was melanotic.  Mr. Harris was treated and
11  released on August 4, 2004. TR 160-161.

12         August 3, 2004, treatment notes indicated that Mr. Harris's
    outpatient medications included Metoprolol and Omeprazole.
13  Omeprazole was prescribed to reduce stomach acid. TR 140-141.
    Mr. Harris was discharged with improvement of his abdominal
14  pain which was resolved. TR 145. Treatment notes indicated that
    Mr. Harris's blood pressure was elevated on his current blood
15  pressure medications.  It was decided to add Hydrylazine. TR136.

16         August 4, 2004, treatment notes indicated that Mr. Harris
    presented with a history of persistent melena.  Notes also indicated
17  that irregularities were present in his gastroesophageal junction and
    a hiatal hernia was present and a duodenal ulcer was present. Mr.
18  Harris underwent an esophagogastroduodenoscopy. TR 178.

19         A Chem Profile reflected that Mr. Harris's Createnine
    levels were elevated.  On August 13, 2004 his Createnine level was
20  elevated at 1.8 and on June 25 2005 his levels were elevated at 2.1.
    TR 300.
21
           August 4, 2004, progress note indicated that Mr. Harris's
22  medical concerns include GI bleeding, HTM, Cardiomyopathy (EF
    27% 2003), and CRI (baseline around 1.6-1.7). TR 323. Notes
23  indicated that Mr. Harris was returning to the hospital with
    abdominal pain and persistent malena.  He reported having some
24  minimal cramping abdominal pain in the morning.  His bowel
    movement was still darker in color than normal. TR 324.  Mr.
25  Harris was assessed with asymptomatic sinus brady. Mr. Harris's
    blood pressure was elevated on his current medications.
26  Medication staff added hydrolozine to his blood pressure

medications. TR 325.  Mr. Harris's sinus brady was also treated with Metoprolol. TR 326.

August 4, 2004, treated notes indicated that Mr. Harris underwent an upper endoscopy which disclosed a gastroesophageal junction at 48 cm, hiatal hernia, Clean-based ulcer in the duodenal bulb.  No evidence of active bleeding. TR 322.

August 13, 2004, treatment notes indicated that Mr. Harris became a new primary care patient.  Mr. Harris's past medical history was significant for cardiomyopathy, ejection fraction 27%, chronic renal insufficiency, and upper GI bleeding secondary to duodenal ulcer.  His active outpatient medications were Ferusomide, Lisinopril, Metroprolol, Omeprazole, and Promethazine. TR 166-167.  Mr. Harris's blood pressure was noted to be 168/94.  Mr. Harris underwent a screening for amphetamines which was negative; for cocaine, which was negative; for cannabis, which was positive; and opiates, which was negative. TR 173.  Mr. Harris's complete laboratory findings are contained at TR 167-178. Notes indicated that Mr. Harris was negative for a major depressive disorder and negative for post-stress disorder syndrome. TR 178.

August 13, 2004, treatment notes indicated that Mr. Harris did not meet the criteria for major depressive disorder.  Notes indicated further "Evaluation of the positive PTSD screen indicates a false positive screen for PTSD. No further evaluation is needed at this time." TR 321.  On this same date, Mr. Harris's active outpatient medications included Furosemide, Lisinopril, Metoprolol, and Omeprazole.  TR 315.

June 25, 2005, treatment notes indicated that Mr. Harris was seen for abdominal pain.  Mr. Harris presented with acute onset upper ABD/epigastric pain 2 hours ago when he was at home.  He reported the pain as sharp, epigastric with radiation to RUQ, associated with nausea and one episode of vomiting.  Mr. Harris indicated his pain started one hour after eating a 7:00 p.m. chicken dinner. TR 310.  Mr. Harris's blood pressure was noted to be 216/135. TR 311.

The assessment of Mr. Harris's condition was that he suffered from abdominal pain that was likely PUD/dyspepsia. Notes indicated that his pain was completely resolved after GI cocktail.  Notes indicate that his HTN urgency was improved with Clonidine/Hydrozaline.  Notes indicated that Mr. Harris was assessed with congestive heart failure. TR 313-314.  Notes also indicated that Mr. Harris's blood pressure was improved with Lasix.  Mr. Harris indicated that he did not want to be admitted to the hospital. TR 314.

1              December 12, 2005, progress notes indicate that Mr. Harris
presented with a need for a medication refill.  Notes indicated that
2    Mr. Harris suffered from cardiomyopathy with an injection fraction
of 27%.  He reported being out of Lasix, and need a refill.  He
3    continues to be treated with Lisinopril, Metroprolol, and
Omeprazole. TR309.  Mr. Harris's Lasix prescription was refilled
4    and he was discharged. TR 310.

5              January 31, 2006, progress notes indicated that Mr. Harris
received follow up treatment for his congestive heart failure.  He
6    continues to take Lisinopril, Metoprolol, and Omeprazole. TR 294-
295.  His blood pressure was noted to 159/110. TR 295.  Notes
7    indicated that Mr. Harris tested negative for amphetamines,
Phenobarbital, benzodyasomide, cannabis, cocaine, methadone,
8    opiates, EZOH, PCP, propoxy coctinin. TR 306.  Mr. Harris was
assessed with a "positive depression screen." He was to be referred
9    to the mental health treatment section for evaluation and treatment,
and was to be started on Celexa.  Notes indicated that Mr. Harris
10    was referred for mental health treatment because of his request.  In
regard to "lipid screening" Mr. Harris was assessed to be a "high
11    risk patient." TR 308.

12    (Plaintiff's Motion (Doc. 21) at 2-9.)

13              Defendant's summary of the relevant medical evidence also includes that

14    plaintiff's

15              bleeding ulcer and abdominal pain resolved with treatment and
medication (Tr. 117, 178-80, 294-95, 308-14).  Plaintiff reported to
16    the VA for a medication refill on December 12, 2005, at which
time he denied any acute symptoms (Tr. 309-10).  An examination
17    revealed unremarkable findings, and Plaintiff was discharged in
stable/satisfactory condition (Tr. 309-10).  On January 31, 2006,
18    Plaintiff stated that he felt good, with no abdominal pain (Tr. 294).
Examination findings were unremarkable, and the physician noted
19    that Plaintiff's ulcer was stable (Tr. 295, 308).

20    (Defendant's Motion (Doc. 24-2) at 1).  Additionally, defendant points out that

21              [t]reatment notes indicated that Plaintiff was known for his
noncompliance, and had not followed up with his primary medical
22    doctor for almost a year since he was last hospitalized (Tr. 201,
215, 221, 310, 314).  Plaintiff also missed appointments, refused
23    recommended treatment, and checked himself out of the hospital
against medical advice (Tr. 128, 129, 149, 152, 212, 309, 314).
24    Plaintiff did not take his blood pressure medication as instructed
and had a significant history of poor compliance with medication
25    (Tr. 121, 201, 215, 221, 224, 310).  Physicians further noted that
Plaintiff's acute hypertensive episode and pulmonary problems
26    were caused by his failure to follow prescribed treatment and by

1    his continued drug use (Tr. 128, 201, 202, 215).

2    (Defendant's Motion (Doc. 24-2) at 2).

3    Upon request of the defendant, plaintiff was examined by Dr. Sanford Selcon.  Dr.

4    Selcon found the following significant medical history:

5    [Plaintiff] was hospitalized in 1999 with a peptic ulcer.
     Apparently, it bled and was cauterized. [Plaintiff] has indicated on
6    his past history in the surgery that he had a hole in the stomach and
     had surgery, which was not the case.  He had EGD, which was
7    done to cauterize the lesion and has had no problems since that
     time.  However, at that hospitalization, he was found to have
8    hypertension.  He has had uncontrolled hypertension since that
     time resulting in at least two hospitalizations for hypertension,
9    chronic renal insufficiency, and pulmonary edema in July 2003 and
     again hospitalized in September 2003.
10

11   (Certified Administrative Record ("CAR") at 325).  During this examination, Dr. Selcon found

12   plaintiff's blood pressure severely elevated, but stated that plaintiff was asymptomatic.  He also

13   identified that plaintiff had been found to have a sleep disorder, and that plaintiff falls asleep

14   several times during the day.  According to Dr. Selcon, plaintiff

15   was told that he has sleep apnea but the evaluation of his sleep
     disorder is ongoing and he may have in addition to sleep apnea
16   another medical problem causing his sleepiness, which is his main
     problem, which prevents him from working for the last six to eight
17   months because of falling asleep throughout the day on a regular
     basis at multiple times a day.
18

19   (CAR at 236).  In reviewing plaintiff's medical records, Dr. Selcon found that plaintiff suffered

20   from

21   severe hypertension status post hypertensive emergency/pulmonary
     edema, congestive heart failure, ejection fraction of 35%, chronic
22   renal insufficiency with creatinine 1.9, polysubstance abuse, recent
     methamphetamine, tobacco abuse, history of heavy alcohol abuse,
23   history of bleeding duodenal ulcer, and history of poor medicine
     compliance.
24

25   (CAR at 236).  Dr. Selcon's impression included: (1) uncontrolled malignant hypertension; (2)

26   history of sleep disorder; (3) history of depression; and (4) history of substance abuse.  (CAR at

239).  His functional assessment is:

> The number of hours that the claimant could sit in an 8-hour work period is without limitations.  The number of hours that the claimant could stand/walk in an 8-hour work period is without limitations.  The amount of weight that the claimant could lift/carry is without limitations.  There are no postural, manipulative, visual, communicative, or workplace environmental limitations.
>
> Note: The functional assessment is based on the assumption that the claimant's blood pressure be adequately treated and controlled so that he may become functional as well as his sleep disorder being corrected so that he is able to work. ...

(CAR at 239).

**B.**   **Procedural History**

Plaintiff's claim was initially denied.  Following denial of his request for reconsideration, plaintiff requested an administrative hearing, which was held on May 2, 2006, before Administrative Law Judge ("ALJ") Antonio Acevedo Torres.

In his June 8, 2006, decision, the ALJ made the following findings:

1. The claimant meets the nondisability requirements for a period of disability and Disability Insurance Benefits set forth in Section 216(i) of the Social Security Act and is insured for benefits through the date of this decision.

2. The claimant has not engaged in substantial gainful activity since the alleged onset of disability.

3. The claimant has an impairment or a combination of impairments considered "severe" based on the requirements in the Regulations 20 CFR §§404.1520(b) and 416.920(b).  The claimant's severe hypertension, status post congestive heart failure, mitral valve regurgitation with severe left ventricular enlargement, and obesity are considered "severe" based on the requirements in the Regulations 20 CFR §§ 404.1520(c) and 416.920(b).

4. Theses medically determinable impairments do not meet or medically equal one of the listed impairments in Appendix 1, Subpart P, Regulation No. 4.

5. The undersigned finds the claimant's allegations regarding his limitations are not totally credible for the reasons set forth in the body of this decision.

6. The undersigned has carefully considered all of the medical opinions in the record regarding the severity of the claimant's impairments (20 CFR §§ 404.1527 and 416.927).

7.   The claimant has the retained residual functional capacity to perform a full range of sedentary work activity on a sustained basis.  Sedentary work includes the ability to sit for at least six hours in an eight-hour period, stand and walk only two hours total, with regular break opportunities, and the ability to lift no more than ten pounds.  By its very nature, work performed primarily in a seated position entails no significant stooping. (Social Security Ruling 83-10).

8.   The claimant is unable to perform any of his past relevant work (20 CFR §§ 404.1565 and 416.965).

9.   The claimant is a younger individual (20 CFR §§ 404.1563 and 416.963).

10.  The claimant has a "high school (or high school equivalent) education" (20 CFR §§ 404.1564 and 416.964).

11.  In view of the claimant's age and residual functional capacity, the issue of transferability of work skills is not material.

12.  The claimant has the residual functional capacity to perform a full range of sedentary work on a sustained basis.  (20 CFR § 404.1567, 416.967).

13.  Using Medical-Vocational Rule 201.28 as a framework for decision-making, there are a significant number of jobs in the national economy that he could perform.  Examples of such jobs include the following unskilled sedentary jobs: press clipping cutter-paster, Dictionary of Occupational Titles, (DOT) 249.587-014; telephone quotation clerk, DOT 237.367-046; and Addresser, DOT 209.587-010. (Exhibit 4E)

14.  The claimant was not under a "disability," as defined in the Social Security Act, at any time through the date of this decision (20 CFR §§ 404.1520(g) and 416.920(g))

Based on these findings, the ALJ concluded that plaintiff was not disabled and, therefore, not entitled to benefits.  After the Appeals Council declined review on October 4, 2006, this appeal followed.

## II.  STANDARD OF REVIEW

The court reviews the Commissioner's final decision to determine whether it is: (1) based on proper legal standards; and (2) supported by substantial evidence in the record as a whole.  See Tackett v. Apfel, 180 F.3d 1094, 1097 (9th Cir. 1999).  "Substantial evidence" is more than a mere scintilla, but less than a preponderance.  See Saelee v. Chater, 94 F.3d 520, 521 (9th Cir. 1996).  It is ". . . such evidence as a reasonable mind might accept as adequate to

support a conclusion." <u>Richardson v. Perales</u>, 402 U.S. 389, 402 (1971).  The record as a whole,

including both the evidence that supports and detracts from the Commissioner's conclusion, must

be considered and weighed.  <u>See Howard v. Heckler</u>, 782 F.2d 1484, 1487 (9th Cir. 1986); <u>Jones</u>

<u>v. Heckler</u>, 760 F.2d 993, 995 (9th Cir. 1985).  The court may not affirm the Commissioner's

decision simply by isolating a specific quantum of supporting evidence.  <u>See Hammock v.</u>

<u>Bowen</u>, 879 F.2d 498, 501 (9th Cir. 1989).  If substantial evidence supports the administrative

findings, or if there is conflicting evidence supporting a particular finding, the finding of the

Commissioner is conclusive.  <u>See Sprague v. Bowen</u>, 812 F.2d 1226, 1229-30 (9th Cir. 1987).

Therefore, where the evidence is susceptible to more than one rational interpretation, one of

which supports the Commissioner's decision, the decision must be affirmed, <u>see Thomas v.</u>

<u>Barnhart</u>, 278 F.3d 947, 954 (9th Cir. 2002), and may be set aside only if an improper legal

standard was applied in weighing the evidence, <u>see Burkhart v. Bowen</u>, 856 F.2d 1335, 1338 (9th

Cir. 1988).

## III.  DISCUSSION

In his motion for summary judgment, plaintiff argues that the ALJ erred in four

ways in determining that he was not disabled.  Specifically, plaintiff argues: (1) the ALJ failed to

include all of plaintiff's severe impairments in the evaluation process; (2) the ALJ failed to credit

plaintiff's and a third party's statements as to the nature and extent of his pain; (3) the ALJ

improperly assessed plaintiff's residual functional capacity; and (4) the ALJ failed to show that

plaintiff could perform substantial gainful work that exists in the national economy, including

utilizing the GRIDS in error and failing to secure a vocational expert's testimony.

### A.      Plaintiff's Severe Impairments

In order to be entitled to benefits, the plaintiff must have an impairment severe

enough to significantly limit the physical or mental ability to do basic work activities.  <u>See</u> 20

/ / /

/ / /

C.F.R. §§ 404.1520(c), 416.920(c).[1]   In determining whether a claimant's alleged impairment is

sufficiently severe to limit the ability to work, the Commissioner must consider the combined

effect of all impairments on the ability to function, without regard to whether each impairment

alone would be sufficiently severe.  See Smolen v. Chater, 80 F.3d 1273, 1289-90 (9th Cir.

1996); see also 42 U.S.C. § 423(d)(2)(B); 20 C.F.R. §§ 404.1523 and 416.923.  An impairment,

or combination of impairments, can only be found to be non-severe if the evidence establishes a

slight abnormality that has no more than a minimal effect on an individual's ability to work.  See

Social Security Ruling ("SSR") 85-28; see also Yuckert v. Bowen, 841 F.2d 303, 306 (9th Cir.

1988) (adopting SSR 85-28).  The plaintiff has the burden of establishing the severity of the

impairment by providing medical evidence consisting of signs, symptoms, and laboratory

findings.  See 20 C.F.R. §§ 404.1508, 416.908. The plaintiff's own statement of symptoms alone

is insufficient.  See id.

Plaintiff claims the ALJ failed to include all of plaintiff's severe impairments,

including his chronic renal insufficiency, sleep apnea, and bleeding duodenal ulcer.  Plaintiff

claims his chronic renal insufficiency, related to his kidney function, his sleep apnea, which

causes him to periodically fall asleep at all times of the day, and bleeding duodenal ulcer, when

combined with his other severed impairments, is sufficient to support a finding of disability.

Plaintiff alleges that had the ALJ properly concluded that these were also severe impairments, he

would have found a disability.  Instead, according to plaintiff, the ALJ erroneously completely

ignored the medical reference to these additional severe impairments.

Defendant argues that the ALJ properly considered all of plaintiff's impairments,

and found that they were not "severe" impairments.  The ALJ found that the evidence supported

---

[1]     Basic work activities include: (1) walking, standing, sitting, lifting, pushing,
pulling, reaching, carrying, or handling; (2) seeing, hearing, and speaking; (3) understanding,
carrying out, and remembering simple instructions; (4) use of judgment; (5) responding
appropriately to supervision, co-workers, and usual work situations; and (6) dealing with changes
in a routine work setting.  See 20 C.F.R. §§ 404.1521, 416.921.

a finding that plaintiff has severe hypertension, status post congestive heart failure, mitral valve regurgitation with severe left ventricular enlargement, and obesity.  The ALJ, in reviewing plaintiff's medical records, identified that plaintiff sought treatment for an ulcer and general abdominal pain.  However, he found that plaintiff's abdominal symptoms improved with treatment (no evidence of recurring bleeding after treatment), plaintiff reported at other times that he had no abdominal pain, and that his ulcer disease was stable.  He therefore concluded that plaintiff's ulcer disease was not a severe impairment.  Specifically, the ALJ found

> the record shows that [plaintiff] has been treated for a bleeding ulcer in August 2004, with no evidence of recurring bleeding.  An endoscopy in August 2004 showed a hiatal hernia and a clean-based ulcer in the duodenal bulb, with no evidence of bleeding.  In December 2005, the claimant reported that he was feeling good, with no chest pain, shortness of breath, or abdominal pain.  In January 2006, it was noted that the claimant's ulcer disease was stable.

(ALJ Decision at 6.)

Plaintiff's argument is that the ALJ erred by not including his bleeding duodenal ulcer.  However, the decision of the ALJ not to include plaintiff's ulcer disease is supported by substantial evidence.  Plaintiff has been seen periodically for ulcer related symptoms.  As plaintiff points out, he was hospitalized in 1999 with a bleeding ulcer that was cauterized.  He was again hospitalized in 2004 for GI bleeding with a history of peptic ulcer, among others.  In fact, in August 2004, plaintiff had a duodenal ulcer with a clot and oozing fresh blood.  He was seen again for abdominal pain in June 2005, but it was completely resolved after a GI cocktail.  By December 2005, plaintiff no longer complained about abdominal pain.  Although plaintiff certainly has a history of abdominal pain and ulcer bleeds, the record does not indicate that this is a severe impairment or that it would have more than a minimal effect on his ability to work, and therefore, the ALJ did not err in excluding this as a severe impairment.

As for the sleep apnea, the ALJ stated that while plaintiff reported a sleep disorder, "the record is devoid of any complaints or treatment for a sleep disorder.  Treating source records do not reveal any findings related to these complaints, nor is there any indication

1  that [plaintiff] was referred for diagnostic testing or referred to any other physician for further

2  explorations of symptoms." (See ALJ Decision at 6).   However, plaintiff claims, and testified at

3  the administrative hearing, that his sleep disorder is one of his main complaints and one of the

4  main reasons why he is unable to engage in basic work activities.  (See CAR at 355).  In

5  reviewing plaintiff's medical records, the court has found that plaintiff's physicians identified

6  that plaintiff may suffer from possible sleep apnea with occasional hypoxemia.  In addition, Dr.

7  Selcon, the consultative physician for the defendant, also identified a sleeping disorder.[2]  In fact,

8  a sleep study to evaluate for CSA was ordered by plaintiff's physician.  (See CAR at 202).  The

9  records do not include any information as to the results of the sleep study, or if a sleep study was

10  actually performed.  However, given the identification of a possibility of a sleeping disorder and

11  plaintiff's testimony regarding his sleeping issues, the record does not support the ALJ's finding

12  that sleep apnea is not a severe impairment.  In fact, it supports finding that the ALJ did not have

13  sufficient information with which to make that determination.

14       Similarly, as to plaintiff's chronic renal insufficiency, the only discussion the ALJ

15  had about any possible impairment from CRI was that

16       [w]hile the record does support a conclusion that the claimant had
         severe hypertension, which sometimes was uncontrolled, there was
17       no evidence of end organ damage, and it is apparent from the
         record that his hypertensive condition was remedial with
18       medication and was stable when he was compliant with taking his
         mediation and discontinue use of methamphetamines and
19       marijuana.

20  (ALJ Decision at 6).  Plaintiff argues that the ALJ completely ignored plaintiff's CRI diagnosis,

21  even though his CRI was repeatedly referenced.  The court agrees.  Plaintiff's medical records

22  indicate a diagnosis of CRI with a baseline creat around 1.7 - 1.9.  (See e.g. CAR at 166, 202).

23  However, this was not discussed by the ALJ in his decision.

24  _____

25       [2]     The ALJ acknowledged Dr. Selcon's finding of plaintiff's history of a sleep
    disorder in his decision.  Although the ALJ found plaintiff to be more limited than Dr. Selcon
26  found, the identification of a sleep disorder by Dr. Selcon further supports the ALJ's obligation
    to more fully develop the record.

1    The ALJ has an independent duty to fully and fairly develop the record and assure

2 that the claimant's interests are considered.  See Tonapetyan v. Halter, 242 F.3d 1144, 1150 (9th

3 Cir. 2001).  When the claimant is not represented by counsel, this duty requires the ALJ to be

4 especially diligent in seeking all relevant facts.[3]  See id.  This requires the ALJ to "scrupulously

5 and conscientiously probe into, inquire of, and explore for all the relevant facts."  Cox v.

6 Califano, 587 F.2d 988, 991 (9th Cir. 1978).   Ambiguous evidence or the ALJ's own finding that

7 the record is inadequate triggers this duty.  See id.  The ALJ may discharge the duty to develop

8 the record by subpoenaing the claimant's physicians, submitting questions to the claimant's

9 physicians, continuing the hearing, or keeping the record open after the hearing to allow for

10 supplementation of the record.  See id. (citing Tidwell v. Apfel, 161 F.3d 599, 602 (9th Cir.

11 1998)).

12    Here, the record is ambiguous at best as to plaintiff's sleep apnea and CRI, and the

13 effects they may have on his ability to engage in basic work activities.  As stated above,

14 plaintiff's physician ordered a sleep test, yet the record is lacking any results of the test.  In

15 addition, plaintiff testified that one of his main problems is his inability to remain awake.  (See

16 CAR at 349.)   But the ALJ did not question him further about his diagnosis nor did he inquire

17 as to the lack of medical records supporting his testimony.  The ALJ did not subpoena additional

18 medical records, question plaintiff's physicians, continue the hearing, keep the record open to

19 allow plaintiff to provide additional information, or in any other way fully develop the record on

20 the effects of plaintiff's purported sleep disorder.  The ALJ actually noted in his decision that

21 although plaintiff alleges a sleep disorder, there is no confirmation in his medical records.

22 Further, there is a significant amount of reference in plaintiff's medical records regarding CRI.

23

24    [3]    It is not clear on the record before the court whether plaintiff was represented by
an attorney at the hearing.  The ALJ refers to Ms. Duarte as an attorney, but plaintiff indicates in
25 his motion for summary judgment that he was represented by non-attorney Danielle Duarte at the
hearing.  Either way, the ALJ has a duty to develop the record, which the court finds was not
26 discharged.

1    However, the ALJ again failed to inquire further as to the specific diagnosis or relevance of CRI

2    on plaintiff's ability to perform basic work activities.  The court finds the ALJ did not discharge

3    his duty to develop the record, and therefore cannot support his findings that plaintiff's sleeping

4    issues and CRI were not severe impairments.  Accordingly, this matter will be remanded to the

5    ALJ for further development of the record.

6         **B.     Credibility**

7              The Commissioner determines whether a disability applicant is credible, and the

8    court defers to the Commissioner's discretion if the Commissioner used the proper process and

9    provided proper reasons.  See Saelee v. Chater, 94 F.3d 520, 522 (9th Cir. 1995).  An explicit

10   credibility finding must be supported by specific, cogent reasons.  See Rashad v. Sullivan, 903

11   F.2d 1229, 1231 (9th Cir. 1990).  General findings are insufficient.  See Lester v. Chater, 81 F.3d

12   821, 834 (9th Cir. 1995).  Rather, the Commissioner must identify what testimony is not credible

13   and what evidence undermines the testimony.  See id.  Moreover, unless there is affirmative

14   evidence in the record of malingering, the Commissioner's reasons for rejecting testimony as not

15   credible must be "clear and convincing."  See id.

16             If there is objective medical evidence of an underlying impairment, the

17   Commissioner may not discredit a claimant's testimony as to the severity of symptoms merely

18   because they are unsupported by objective medical evidence.  See Bunnell v. Sullivan, 947 F.2d

19   341, 347-48 (9th Cir. 1991) (en banc).  The Commissioner may, however, consider the nature of

20   the symptoms alleged, including aggravating factors, medication, treatment, and functional

21   restrictions.  See id. at 345-47.  In weighing credibility, the Commissioner may also consider: (1)

22   the claimant's reputation for truthfulness, prior inconsistent statements, or other inconsistent

23   testimony; (2) unexplained or inadequately explained failure to seek treatment or to follow a

24   prescribed course of treatment; (3) the claimant's daily activities; (4) work records; and (5)

25   physician and third-party testimony about the nature, severity, and effect of symptoms.  See

26   Smolen v. Chater, 80 F.3d 1273, 1284 (9th Cir. 1996) (citations omitted).

1          Here, the ALJ found plaintiff's credibility to be lacking because of inconsistent

2  statements, plaintiff's daily activities not supporting the degree of limitations he claimed, gaps in

3  time in which plaintiff sought medical care, plaintiff's noncompliance regarding his mediation

4  and recommended treatments, and plaintiff's drug use.  The ALJ's findings regarding plaintiff's

5  credibility is supported by the record and the ALJ identified specific, cogent reasons for

6  questioning plaintiff's credibility.  However, in light of this case being remanded as discussed

7  above, the ALJ is encouraged to reevaluate plaintiff's credibility in light of the fully developed

8  record, specifically any evidence uncovered as to plaintiff's sleep apnea and CRI.

9          **C.**    **Residual Functional Capacity**

10          Residual functional capacity is what a person "can still do despite [the

11  individual's] limitations." 20 C.F.R. §§ 404.1545(a), 416.945(a) (2003); see also Valencia v.

12  Heckler, 751 F.2d 1082, 1085 (9th Cir. 1985) (residual functional capacity reflects current

13  "physical and mental capabilities").  In determining residual functional capacity, the ALJ must

14  assess what the plaintiff can still do in light of both physical and mental limitations.  See 20

15  C.F.R. §§ 404.1545(a), 416.945(a) (2003); see also Valencia v. Heckler, 751 F.2d 1082, 1085

16  (9th Cir. 1985) (residual functional capacity reflects current "physical and mental capabilities").

17  Where there is a colorable claim of mental impairment, the regulations require the ALJ to follow

18  a special procedure.  See 20 C.F.R. §§ 404.1520a(a), 416.920a(a).  The ALJ is required to record

19  pertinent findings and rate the degree of functional loss.  See 20 C.F.R. §§ 404.1520a(b),

20  416.920a(b).

21          Here, the ALJ found plaintiff capable of performing a full range of sedentary work

22  on a sustained basis.  Plaintiff claims that in reaching this decision, the ALJ failed to property

23  assess and include all of his severe impairments.  Based on the above discussion and the court's

24  finding that the ALJ failed to properly develop the record, there is insufficient information before

25  the court to make this determination.  Accordingly, on remand, the ALJ is to reevaluate

26  plaintiff's residual functional capacity based on a fully developed record.

## D.    GRIDS versus Vocational Expert

The Medical-Vocational Guidelines ("Grids") provide a uniform conclusion about disability for various combinations of age, education, previous work experience, and residual functional capacity.  The Grids allow the Commissioner to streamline the administrative process and encourage uniform treatment of claims based on the number of jobs in the national economy for any given category of residual functioning capacity.  See Heckler v. Campbell, 461 U.S. 458, 460-62 (1983) (discussing creation and purpose of the Grids).

The Commissioner may apply the Grids in lieu of taking the testimony of a vocational expert only when the grids accurately and completely describe the claimant's abilities and limitations.  See Jones v. Heckler, 760 F.2d 993, 998 (9th Cir. 1985); see also Heckler v. Campbell, 461 U.S. 458, 462 n.5 (1983).  Thus, the Commissioner generally may not rely on the Grids if a claimant suffers from non-exertional limitations because the Grids are based on strength factors only.  See 20 C.F.R., Part 404, Subpart P, Appendix 2, § 200.00(b).  "If a claimant has an impairment that limits his or her ability to work without directly affecting his or her strength, the claimant is said to have non-exertional . . . limitations that are not covered by the Grids."  Penny v. Sullivan, 2 F.3d 953, 958 (9th Cir. 1993) (citing 20 C.F.R., Part 404, Subpart P, Appendix 2, § 200.00(d), (e)).  The Commissioner may, however, rely on the Grids even when a claimant has combined exertional and non-exertional limitations, if non-exertional limitations do not impact the claimant's exertional capabilities.[4]  See Bates v. Sullivan, 894 F.2d

---

[4]    Exertional capabilities are the primary strength activities of sitting, standing, walking, lifting, carrying, pushing, or pulling and are generally defined in terms of ability to perform sedentary, light, medium, heavy, or very heavy work.  See 20 C.F.R., Part 404, Subpart P, Appendix 2, § 200.00(a).  "Sedentary work" involves lifting no more than 10 pounds at a time and occasionally lifting or carrying articles like docket files, ledgers, and small tools.  See 20 C.F.R. §§ 404.1567(a) and 416.967(a).  "Light work" involves lifting no more than 20 pounds at a time with frequent lifting or carrying of objects weighing up to 10 pounds.  See 20 C.F.R. §§ 404.1567(b) and 416.967(b).  "Medium work" involves lifting no more than 50 pounds at a time with frequent lifting or carrying of objects weighing up to 25 pounds.  See 20 C.F.R. §§ 404.1567(c) and 416.967(c).  "Heavy work" involves lifting no more than 100 pounds at a time with frequent lifting or carrying of objects weighing up to 50 pounds.  See 20 C.F.R. §§ 404.1567(d) and 416.967(d).  "Very heavy work" involves lifting objects weighing more than

1  1059, 1063 (9th Cir. 1990); Polny v. Bowen, 864 F.2d 661, 663-64 (9th Cir. 1988).

2       In cases where the Grids are not fully applicable, the ALJ may meet his burden

3  under step five of the sequential analysis by propounding to a vocational expert hypothetical

4  questions based on medical assumptions, supported by substantial evidence, that reflect all the

5  plaintiff's limitations.  See Roberts v. Shalala, 66 F.3d 179, 184 (9th Cir. 1995).  Specifically,

6  where the Grids are inapplicable because plaintiff has sufficient non-exertional limitations, the

7  ALJ is required to obtain vocational expert testimony.  See Burkhart v. Bowen, 587 F.2d 1335,

8  1341 (9th Cir. 1988).

9       In this matter, the court is unable to resolve whether or not the ALJ erred in

10  utilizing the Grids instead of a vocational expert until the record is fully developed on remand

11  regarding to the severity of plaintiff's sleep apnea and CRI.  Sleep apnea would be considered a

12  non-exertional limitation which may or may not impact plaintiff's exertional capabilities.  On

13  remand, the ALJ will be required to make the determination of whether plaintiff's sleep apnea

14  and CRI are sufficient non-exertional limitations to require the use of a vocation expert.

15  **IV.  CONCLUSION**

16       For the foregoing reasons, this matter will be remanded under sentence four of 42

17  U.S.C. § 405(g) for further development of the record and/or further findings addressing the

18  deficiencies noted above.

19       Accordingly, IT IS HEREBY ORDERED that:

20      1.    Plaintiff's motion for summary judgment is granted;

21      2.    The Commissioner's cross motion for summary judgment is denied;

22      3.    This matter is remanded for further proceedings consistent with this order;

23

24  100 pounds at a time with frequent lifting or carrying of objects weighing 50 pounds or more.
   See 20 C.F.R. §§ 404.1567(e) and 416.967(e).

25       Non-exertional activities include mental, sensory, postural, manipulative, and
environmental matters which do not directly affect the primary strength activities.  See 20 C.F.R.,

26  Part 404, Subpart P, Appendix 2, § 200.00(e).

and

        4.     The Clerk of the Court is directed to enter judgment and close this file.

DATED: February 26, 2008

                                      **CRAIG M. KELLISON**
                                      UNITED STATES MAGISTRATE JUDGE